Your argument is Macon v. Mahone. Mr. Garland. Good morning, Your Honors. My name is Nicholas Goen and I represent Ronald Macon, an incarcerated We are here today because the District Court erred in granting the defendant's summary judgment on their affirmative defense for Mr. Macon's failure to exhaust his administrative remedies under the PLRA. The District Court erred on two grounds, Your Honors. First, Mr. Macon did exhaust his administrative remedies in 2011 after he learned of the defendant's negligence as required by the Administrative Code 504.810. Second, Mr. Macon was not required to exhaust those remedies before 2011 because he did not have the evidence before him to know that the defendant's negligence led to his advanced condition. The Court reviews the District Court's grant of summary judgment on this PLRA claim de novo, despite the defendant's position, because there are issues of both law and fact that the Court must address. Specifically, there are two issues of law. First, as a matter of law, was Mr. Macon required to exhaust his remedies in 2010 v. 2011? And second, as a matter of law, did Mr. Macon's actions in submitting his grievance to the ARB and his follow-up to the ARB in 2011 satisfy those requirements? You've just recast what are really factual questions as legal ones, presumably because the standard of review is better. But this really is a fact-bound question about when he had notice, and that's what we're here on, essentially, not whether there had to be exhaustion. It's clear there had to be exhaustion. The question is when he had notice and whether it was 60 days before. Yes, Judge. Even under a clearly erroneous standard, the District Court erred. Because looking at the entire factual record that was before Judge Siddiq, Macon's uncontradicted testimony established that although the defendants informed him in January 2010 that he was suffering from late-stage kidney disease, there was no evidence before Mr. Macon that he knew that the defendant's negligence was the cause of his condition continuing. Specifically, the District Court focused in his order, in his findings, that Mr. Macon should have known based on conversations with a nurse and conversations with his sister. However, the District Court did not rely on any case, and the defendants did not cite any case, which requires that the prisoner should know. The administrative code is fairly clear in its plain language, and that is the individual must have actual knowledge. It doesn't use those terms, actual knowledge, but the language is clear. You must file a grievance when you have discovered that a grievance exists. Mr. Macon did not discover a grievance exists until he obtained his medical records in May of 2011. Now, although the records that Mr. Macon ultimately relied upon were in his possession based on a previous grant of those records related to a hepatitis C condition that he contracted in 2008 or 2009, that's not the point, because he did not know based on those records that the information contained in them would allow him to know that his kidney condition could be determined. He was relying on the defendants for that information. It's the defendants' burden to prove that Mr. Macon knew of the defendants' negligence led to his worsening condition. And in fact, the court shifted that burden to Mr. Macon against the plain language of the administrative code 504810. But hadn't the nurse told him in 2010 that the doctors had known about his disease? Respectfully, Judge Posner, no. The nurse told him, a nurse named Jay, told Mr. Macon that the doctors should have known. The nurse never told Mr. Macon what the doctors knew because the nurse didn't know. The nurse never told Mr. Macon, hey, go get your medical records because the information is in there and I'll take a look at them for you. That information is not in the record. And more importantly, even if the court determined that Mr. Macon should have filed a grievance in 2010, the policy position for the administrative grievance under the PLRA is not to adjudicate a claim. Rather, the purpose of the grievance process is to put the defendants on notice that a prisoner has a problem that wants to be aggrieved. Here, the defendants were on notice as early as January 2010 that there was a problem. They specifically failed to diagnose and treat Mr. Macon. Well, now wait. You can't say that you don't have to file a grievance when the defendant knows that he's done something wrong. That can't be right. Is that what you're saying? I'm saying that Mr. Macon can only file a grievance when he was aware of the defendant's negligence. I thought you said that he doesn't have to file a grievance if the defendants are aware that they've done something wrong. Yes, Judge Poldren, because the purpose of the grievance is to put the defendants on notice. No, but that can't be right. Then they'd never have to file a grievance, right? You just say, well, they did something wrong. They knew it, so I don't have to file a grievance. I just file a lawsuit. No, Judge, that's not what I mean. What I mean is this. In this particular situation where you're dealing with a medical condition for which there's no evidence in the record that Mr. Macon was aware that he was suffering from this condition beforehand. Well, I don't understand you. In 2010, he certainly knew he had a kidney disease. But he didn't know why he had the disease. Well, but the question is what the nurse said to him. The nurse told the nurse. The dialysis nurse. Right. The nurse told Mr. Macon that these kidney disorders don't come on suddenly. The nurse never said, hey, the defendants didn't diagnose you properly. The nurse didn't say there's a problem here. The nurse didn't say there's negligence. The nurse says this is odd. Unless there's something, unless there's some trauma, that these conditions don't come on automatically. Well, what about his sister, who I guess is also a nurse? As I understand from the record, his sister said the same thing. But that, too, does not establish that Mr. Macon knew. Well, they also told him that his previous blood work would show the signs. And so he had knowledge at that point that the doctors would have had information from which they could have made the diagnosis and did not. Correct. The information was in those records. And he was told by the nurse that his blood work would show whether or not the doctors had missed something. Correct, Judge Sykes, but this is the same information that the doctors themselves had. That doesn't create an exception to the exhaustion requirement or the requirement to file a grievance. No, it does not create an exception to the exhaustion requirement. But if the purpose of the exhaustion requirement is to put the defendants on notice, this flips the exhaustion requirement on its head. You're asking for an exception to the exhaustion requirement that would essentially blow a hole in the requirement if we accepted it. I would respectfully disagree with that. I don't believe this is an exception that we're seeking. We're seeking to acknowledge that Mr. Macon followed it. Are you saying he wouldn't have to file a grievance? In that hypothetical, there would be actual knowledge. Answer my question. Are you saying he would or would not have to file a grievance in that situation? If the dialysis... Don't say if, just answer my question. In that situation, yes, he would have to file a grievance. But that's not the situation, respectfully, that's before the court. The situation before the court is Mr. Macon didn't know. And the lower court, the district court... If I may, Mr. Gaffney, what do you believe the nurse said to him? What do you think the record shows the nurse said to him regarding the blood work? What do I think the nurse said to him? Well, what do you read that to mean? What do we have before us? Did the nurse say the doctor should have known based on the blood work? I believe the record says that the blood work would indicate a problem. No, there's no mention of a doctor, that the doctors would have known based on that blood work. The phrasing doesn't include, in your judgment, the physician. Well, I think the implication is there, but I can't say. Yeah, right. So isn't the implication then the physicians were aware of the condition? When she says the records show you have the disease and the doctors had to know of it because of it? I mean, isn't that pretty much saying there was an awareness by the physicians of the situation? Yes, but in that situation, the requirement is then shifting from the defendant's affirmative defense to prove that he knew to Mr. Macon's, onto Mr. Macon's plate. You mean who the particular physicians were? No, we're not saying that Mr. Macon had to know who the particular physicians were. Right. It's sufficient under the case law. He wasn't alerted that there's some claim of, if you will, malpractice at that point, when the nurses give that, particularly the nurses who attend to the dialysis. Does that make that assessment? Yes, Your Honor. Yes, Judge Plumb. Based on the record, he was aware that there could be an issue, but he was not knowledgeable that there was. Okay, thank you, Mr. McAllen. Mr. Cherish? May it please the Court. My name is Michael Cherish, and I represent Dr. Sylvia Mahone, Dr. Dennis Larson, the Wexford Health Sources. Judge Shadid held a PAVI hearing on May 23, 2013, for the purpose of determining whether plaintiff had properly exhausted his... As you say in your brief, page 4, unknown nurse advised him there are stages of kidney failure. This should have been detected from prior blood work, and his condition could have been prevented. Now, is that a quotation or what? Paraphrase? What did she say to him? That it's our understanding of what the plaintiff testified to at the PAVI hearing, based on the pages cited. It's not a word-for-word citation. No, we believe that a fair... This is the plaintiff's, what the plaintiff said? Yes, Your Honor, at the PAVI. What did he say? We believe that what the plaintiff said was that late... Why do you believe what the plaintiff said? Don't you know what he said? Yes, that's on pages 42, 43, 56, and 57. And what did he say? He said that an unknown nurse, who he believes to be named Jay, advised him that there were stages of kidney failure, that this condition should have been detected from prior blood work, and that it could have been prevented. So that's his language? It would not be word-for-word, no. Okay. Judge Shadid made certain factual determinations, or the factual determination really won, that the plaintiff did not file a timely grievance, even if that grievance was filed in June of 2011, after hearing extensive evidence from Mr. Macon himself. I think this Court reviews that today under the clearly erroneous standard, and that is whether or not there's a definite and firm conviction that a mistake has been made. Plaintiff testified, page 40, that he knew of his condition as early, and that is the kidney condition, that he has advanced kidney disease from Dr. Taller while he was still at Pontiac, in January of 2010. In the five-month period between January 10th and May 10th, this is at page 41, he saw a specialist, not in the prison, but at the University of Illinois at Chicago, who told him that he had, in fact, end-stage kidney disease. In August of 2010, he was advised by his sister, who was a nurse, that kidneys don't fail suddenly, that there are stages to failure, that this is not a sudden and tumultuous event. That's at pages 42 and 56 of his testimony. At some time in late 2010, towards the end of the year, as we just spoke of, a nurse, whose name he's not certain of, but he identified as Jay, advised him that there were stages of kidney failure, and that this should have been detected from prior blood work. Plaintiff testified at page 43 that this is, in fact, what raised his concern, that these defendants may be guilty of misconduct in his medical treatment. And this is at the end of 2010, six months before the grievance he claims to have filed. Plaintiff testified, pages 46 and 47, that he had his medical records for the purpose of determining whether or not another condition, hepatitis C, had been properly treated in August of 2009. This is over a year before that. He has these records, you say? Yes, Your Honor. What does this lay prisoner have to do with those records? He should have sought counsel of a doctor? What's his position? No. What this lay prisoner did was he looked at certain lab results. He was looking at them not for this purpose, but for the purpose of hepatitis C treatment. These are the exact same lab results that he now claims, at page 52 of his testimony, is the primary basis for his claim in this case, because they were out of limits. This prisoner believed he had the ability to interpret these lab results. And in the lab results they will say things like, out of limits, out of range. He was looking at them for a different reason, but he had them in August of 2009. And he says, at page 52, these out-of-range lab results with regard to this condition are the primary basis for his belief that there was misconduct. He had these. He had these in August of 2009. When you look at all of these. Just pursuing Judge Flom's question, where are the medical records? Are they in his appendix? I don't know. What are these things? Offender outpatient progress notes. Is that what we're talking about? No, Your Honor. They would be lab results. Where are they? That I'm not sure. Are they in the record? He references them in the testimony. Are they in the record? I don't believe so. But he references them in his testimony. I'm sorry. Made a mistake. It's Exhibit A to the complaint. I'm sorry. Okay. And we've got elevated creatinine levels as of June 2008, slightly elevated. And then significant elevation in June 2009 and January 2010 when the diagnosis is made. And do those creatinine levels indicate something that a lay person could understand? Not necessarily, Your Honor. But he says he believed that certain out of range. You see, they say in range, out of range. He believed when he actually saw them later on. Is that what the creatinine readings say, in range and out of range? There are certain levels are circled or they're in range or out of range. I don't see this. Where is this? I believe what he's referring to. Appendix A in his brief is the complaint. I believe these are RSA. That's what I said, offender infirmary progress notes. Is that it? I don't know. I don't understand. This is critical. You keep talking about these records. You don't even know where they are, what they say. They're attached to his complaint, Your Honor. Pardon? They are attached to his complaint. They're unreadable. Look, what kind of education does Macon have? Basically a primary education. So how is he going to make sense of medical reports? Honestly, I don't think he would, but he said he did. I wouldn't expect him to, but he said he did. In fact, he said that they were his primary motive. When you or someone else was deposing him, you accepted the statements made in his complaint, I guess it's in the complaint, about what exactly these nurses told him, right? That was accepted. You didn't say, did you really say that? Did the nurse really say that to you? You accepted that, right? True. Well then, according to him, he was told by a nurse that they should have detected this earlier. True. Why isn't that enough? It should be. Pardon? It should be, and I'm not saying it isn't. What I'm saying is that Judge Shadid looked at all of these factors. He heard all of this evidence, and from all of it, he came to the factual determination that the grievance was not timely filed. I'm not zeroing in on any particular factor. I'm not saying any one factor is determinative. I'm saying Judge Shadid considered them all and heard Mr. Makin out. Okay, so you're sort of turned on its head. You're really arguing that he knew everything in 2010. That's correct. Everything he needed to know. What I'm saying is that he knew enough to be able to know that there was this problem. But aren't you asking an awful lot of an uneducated person? Under these circumstances, I don't think so. Because he's told, you know, he's got this disease. It must have started earlier, and it would have shown up in blood tests. How does he connect that with deliberate indifference to his personal safety? I think what he has to connect it to. I think it's just, look, I don't think you're being realistic about the intellectual capacities of these prisoners when they're given these kind of fragmentary warnings. If the nurses said to him, your doctors really screwed up, they're incompetent. They should have detected this and you'd be fine because the disease developed slowly. If they'd said that, yes, then he would have known he had to complain. But all this nebulous would have shown up on the blood test. What are you supposed to do with that? I believe, Your Honor, that what he has to know, what the administrative code requires, is that he discovers any incident, occurrence, or problem. Yeah, and these administrative codes are written to be unintelligible to uneducated people. I think that he... Bureaucratic gibberish. I think, Your Honor, that if we require the higher quantum, then it's almost impossible for someone like this to ever have that time limit start running. Because you get to the point where you're almost saying... No, if the nurse said to him, look, the doctors, you know, they've screwed up. They could have prevented your disease. Now you're going to die if you don't get a kidney transplant or something. So that would cause bells to ring in his head. But this is all very nebulous. I think you have that if you take everything together that he has from 2009 until the end of 2010. I think you're just asking too much of these people. You're just unrealistic about them. And these grievance procedures are written in a way that are designed to confuse, confuse uneducated people who are the prison population for the most part. Apart from the nurse, which we've discussed, when you say take it all together, what do we have, the building blocks for the district judge beyond the nurse situation? He has his medical records. The medical records, okay. He has clear knowledge that he is an end-stage renal failure. That's told to him in January 2010 by Dr. Taller at Pontiac, as well as an outside specialist at UIC. He's told that this is by two of these physicians. This is a serious disease. In August of 2010, his sister, who's a medical professional, a nurse, says this doesn't happen suddenly. There are stages. What on earth would that mean to someone to be told this disease doesn't happen suddenly? How does that connect to a grievance? I think it's telling him. You get cancer. It grows slowly over many years. So you're told, yeah, well, this cancer started 20 years ago. What are you supposed to do with that information? Get your records. See why it wasn't treated earlier. Oh, get your records. See why it wasn't treated earlier. Well, how is he going to figure out what these records say? They're all scribble-scrabble. They're not even clearly written. They're all handwritten. At some point, he says he did them. He took those exact records, and those were the basis, and these lab results we've been discussing. His records were the basis for ultimately filing the grievance. So at some point, he did come to the conclusion, whether correct or incorrect, that he wasn't properly treated, and he filed the grievance. He did that in June of 2011. He actually did that. He was able to. Okay, well, thank you, Mr. Charge. So Mr. Gowan, do you have anything? Mr. Gowan, I'm sorry. Do you have anything further? I stand on my arguments, judges. Okay, well, thank you very much to both counsels. Thank you.